IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

NANCY DELILAH JOHNSON,

        Plaintiff,

        v.                                Civil Action No. 2:08-CV-51

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

Plaintiff, Nancy Delilah Johnson, (Claimant), filed a Complaint on March 10, 2008 seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed his Answer on May 19, 2008.[2] Claimant filed her Motion for Summary Judgment on June 17, 2008.[3] Commissioner filed his Motion for Summary Judgment on July 15, 2008.[4]

B.    <u>The Pleadings</u>

    1.    <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

    2.    <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 11.

[4] Docket No. 13.

C.  Recommendation

I recommend that:

1.  Claimant's Motion for Summary Judgment be **DENIED** because: 1) the ALJ did not err in relying upon the VE's testimony regarding the number of jobs available in the national economy that Claimant could perform; 2) whether the evidence of mental functioning was developed at the initial and reconsideration levels is irrelevant to the current proceeding; 3) the ALJ's RFC assessment was a "mental assessment;" 4) the ALJ did, in fact, rely upon medical opinions in making his disability determination; and 5) remand is not warranted because the transcript was not so inadequate as to require another hearing.  However, the Court recommends the case be **REMANDED** with instructions that the ALJ recontact Dr. Latif to determine whether Claimant's GAF score is 50, or within a range of 50-65.

2.  Commissioner's Motion for Summary Judgment be **GRANTED** except on the issue recommended to be remanded.

## II.  Facts

A.  Procedural History

Claimant filed her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits on October 20, 2004.  (Tr. 57).  Claimant alleged disability since February 15, 2003, due to chronic abdominal pains, ulcerative colitis, status post low back and right knee surgery, a bipolar disorder, Post Traumatic Stress Disorder (PTSD), an Obsessive Compulsive Disorder (OCD), panic attacks, a mood disorder and agoraphobia.  (Tr. 85-98).  The claims were denied initially on March 17, 2005, (Tr. 46) and upon reconsideration on July 15, 2005.  (Tr. 43).  Claimant filed a written request for a hearing on August 5, 2005.  (Tr. 42).

Claimant's request was granted and a hearing was held on October 18, 2006. (Tr. 441-76).

The ALJ issued an unfavorable decision on August 31, 2007. (Tr. 17-26).[5] The ALJ determined Claimant was not disabled under the Act because given her vocational profile (i.e. age, education, and work history) and RFC, she could make a successful adjustment to other specific unskilled sedentary and light work that existed in significant numbers in the national economy, consistent with the testimony of Diana Sims, an impartial vocational expert (VE). (Tr. 17-26). On September 7, 2007, Claimant filed a request for review of that determination. (Tr. 10). The request for review was denied by the Appeals Council on January 11, 2008. (Tr. 5). Therefore, on January 11, 2008, the ALJ's decision became the final decision of the Commissioner. Having exhausted her administrative remedies, Claimant filed this action, which proceeded as set forth above.

B.   Personal History

Claimant was twenty-two years old on February 15, 2003.[6] Her date of birth is July 5, 1979. (Tr. 57, 445). Claimant was therefore a "younger individual 18-44" within the meaning of the regulations from February 15, 2003 (the "period at issue"). 20 C.F.R. § 416.968. Claimant has a high school education (Tr. 447) and prior work experience as a cashier, secretary, customer service representative and a waitress. (Tr. 63, 69, 448-53).

C.   Medical History

The following medical history is relevant to the issue of whether the mental limitations

_____

[5] The decision was delayed due to problems getting a consultative examination requested by Claimant's attorney. Claimant was not examined until May 16, 2007. (Tr. 431-38).

[6] Claimant had to prove her disability commenced on or before September 30, 2006, in order to be entitled to DIB, 42 U.S.C. § 423(a),(c).

contained in the ALJ's questioning of the VE were internally inconsistent with the narrative

decision:

**Tri-State Community Health Center (Tr. 104-09)**
4/13/98
Bilateral Breast Ultrasound - Impression: No acute abnormalities
8/20/98
Open MRI of the Lumbar Spine - Findings:
1.  At L5/S1, there is disc desiccation and loss of normal disc space height.  Additionally, there is a right parasagittal disc herniation, small to moderate in size.  This is indents the thecal sac, and displaces the right S1nerve root posteriorly in the right lateral recess.  It is unchanged in size when compared to 12/30/97.
2.  At L3/4, there is minimal to mild posterior bulging of the disc annulus, but there is no resultant spinal stenosis, lateral recess narrowing and no lateral extension to cause neural foraminal narrowing.  No spondylolisthesis.
3.  No compression fractures.
4.  No evidence for any conus mass.
5.  There are multiple Schmorl;s nodes involving the inferior end of the plate of T12, superior end plate of L2 and the inferior end plate of L2 and L3.
8/3/99
MRI of Lumbar Spine:
Indication - Pain, paresthesias right leg.  The study was compared with a previous scan on 8/20/98.  This study again shows a herniated disc at L5/S1 centrally and lateralizing to the right.  The present findings may be slightly increased from the prior exam.  The other disc spaces and vertebral bodies appear to be unremarkable.  No other herniated disc is seen.
Impression:
1.  Moderate size herniated disc at L5/S1 centrally and lateralizing to the right slightly increased in size from the prior study.
2.  No other significantly abnormality is demonstrated.

**Sheila Crowe, M.D. (Tr. 111-53)**
6/7/03
Primary Diagnosis - Chronic abdominal pain
Hospital Course:
At endoscopy, the patient had a colonoscope that was able to be advanced into the terminal ileum, at which time it was noted that she had some diffuse subepithelial hemorrhages and a patchy, granular nodularity.  There were no ulcerations or erosions or exudate visualized.  Biopsies were taken.  It was noted that on advancing the scope, the patient had a very tortuous sigmoid colon which was presumed to be secondary to her adhesions.  The colonic mucosa was normal throughout.  Pathology reports of the terminal ileal samples demonstrated segments of intestinal mucosa with mild lymphoid hyperplasia and malanosis.  No evidence of Chron's disease.  Biopsies of the right and left colon were within normal limits.  Given the patient's significant pain, an acute to pain/psych consult was obtained which revealed the patient to have

not only organic causes of pain secondary to adhesions and functional bowel disease, but significant social and familial stressors.

**Winchester Medical Center (Tr. 154-226)**
5/19/03
Chief Complaint: Abdominal pain

History of Present Illness: Patient is a generally healthy 23-year-old female who has had what she relates to be a 2 to 3-year history of intermittent abdominal pain. She has had 2 procedures in the past for adhesiolysis, and by history, she states that her pain was similar to what she is having now. She states that her current bout of abdominal distress has been off and on for at least a month. She states that she is worse now, and has been worse over the last 2 days.

Past Medical History: Other than the above complaints, she medically is basically healthy.

She has had multiple surgeries in the past including -
1. Total hysterectomy (July 2002) for cervical carcinoma
2. Ovarian cystectomy
3. L4 to S1 diskectomy
4. Right knee surgery
5. Lysis of adhesions for pain (Dec. 2001)
6. Appendectomy (age 6)
7. Lysis of adhesions ("within the last 2 years"). She states that both of the surgeries for abdominal pain were for pain similar to what she is experiencing now.

Physical Examination:
HEENT/Neck - Normocephalic, supple neck, no adenopathy
Chest - Equal expansion bilaterally with clear lung sounds bilaterally
Heart - S1, S2, with no murmurs, rubs or gallops
Back - Midline spine, no flank tenderness to percussion
Abdomen - Soft, flat, no masses, no organomegaly. Hypoactive bowel sounds are present. There is tenderness to palpation in the right upper quadrant and somewhat less in the right lower quadrant. No masses are appreciated.

Impression - Recurrent abdominal pain, etiology unclear, nonsurgical abdomen at this time, possible inflammatory bowel disease.

5/30/03
Assessment - 23-year-old white female with recurring abdominal pain and extensive abdominal surgeries, presents with 24 hour history of profound abdominal pain, fever, nausea and vomiting. The patient was recently discharged from the hospital with similar symptoms which ultimately did resolve, but unable to find etiology behind pain and ultimately was not considered a surgical candidate. The patient was discharged home in improved condition. At the time of her hospitalization, she did have an abnormal CT scan which suggested a partial small bowel

obstruction, but the contrast did go all the way through to the colon. At this time, it is possible that her symptoms could be secondary to a partial small bowel obstruction, irritable bowel syndrome, inflammatory bowel syndrome versus adhesions.

**Physical RFC (Tr. 227-34)**
3/4/05
Exertional Limitations:
Occasionally lift and/or carry 50 pounds
Frequently lift and/or carry 25 pounds
Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
Push and/or pull (including operation of hand and/or foot controls) unlimited

Postural Limitations:
Occasionally climbing and frequently balancing, stooping, kneeling, crouching and crawling.
Avoid aggressive climbing post lumbar surgery

No manipulative, visual, communicative or environmental limitations

**Tri-State Community Health Center (Tr. 236-96)**
4/8/98
This is an 18 year old woman who has been here several times for irregular, or what she considers, an abnormal period, along with persistent vomiting. No diarrhea, chills or fever. Also complains of severe breast tenderness. Her main concern was being pregnant, this in spite of the fact that she is on birth control. In speaking with her, over the last several months she has been under a lot of stress revolving around her parents, where she is living and the fact that she is now out on her own and having to pay the bills. She admits she has been depressed for several months now due to the stress.

Physical examination:
Heart - RRR
Lungs - clear
Thyroid gland is normal in size and coutour, no adenopathy of the supraclavicular, anxillary area. Tenderness of the right breast in the supramedial area.

Assessment:
Right breast mass and bilateral fibrocystic breast disease. Depression and anxiety.

4/22/98
Her breasts are still tender.
Assessment:
Fibrocystic breast disease. Breast tenderness

4/29/98

She slipped at her job at Hardee's and hurt her back. She had an injection for a painful back in January which seemed to relieve most of her pain. It was noted that she had a disc out at L5-S1.
Assessment:
Lumbar strain

5/4/98
Physical Examination:
She has tenderness over the lower lumbar spine area on either side of the muscular area of the lumbar spine. She moves very slowly. DTRs seem to be decreased in the right lower leg vs. the left although this is slight.
Assessment:
Lower back strain with radiculopathy

6/10/98
Assessment:
Migraine headache

8/6/98
Assessment:
Left otitis media
Left externa otitis
Sinusitis
Asthmatic bronchitis

8/25/98
Assessment:
Low back pain

10/2/98
Assessment:
Resolving phlebitis, vein in right forearm
Sinusitis

11/30/98
Assessment::
Mild cellulitis, left hand

12/24/98
Assessment:
Low back pain with radiculopathy

1/15/99
Assessment:
Sinusitis

**Western Maryland Health System (Tr. 297-379)**
10/6/04
Chief Complaint:
Flank injury
Urinating blood

Physical Examination:
Examination reveals no bruising. There is no external evidence of trauma. No abrasions. No bruising. No lacerations. She does have tenderness over the right ribs which is diffuse. Lungs are clear, abdomen is soft. Pelvic compression test is negative. There is some lumbar tenderness although again, no external evidence of trauma. Extremity exam is unremarkable. Pulses are good. Neurological exam is nonfocal. There is no head injury, no cervical tenderness. X-rays of the ribs, chest, lumbar spine, pelvis and hip were negative and revealed no acute fracture.

Diagnosis - back contusion

3/13/05
Final Diagnoses
1. Possible ulcerative colitis
2. Possible remnant of ovary with cystic degeneration

**Physical RFC (Tr. 380-87)**
7/7/05
Exertional Limitations:
Occasionally lift and/or carry 50 pounds
Frequently lift and/or carry 25 pounds
Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
Push and/or pull (including operation of hand and/or foot controls) unlimited

Postural Limitations:
Frequently climbing ramps/stairs and occasionally, stooping, kneeling, crouching and crawling. Avoid climbing ladders/ropes/scaffolds and balancing.

No manipulative, visual, communicative or environmental limitations except to avoid all exposure to hazards such as machinery, heights, etc. due to history of blackouts and dizziness.

Symptoms - ADL's functional but she says she forces herself to do what needs to be done and sue to pain needs to be able to sit down or lie down when needed, lifts 5 lbs., walks 20-25 min and then rests 10 min maybe, problem squatting, bending, reaching, kneeling, hearing (but explained that this is ringing in ears when she has severe pain), using hands. Allegations are not fully supported.

**Western Maryland Health System (Tr. 388-415)**

4/14/06:

Physical Examination:

Neck - Supple.  Cervical spine is diffusely tender.

Chest - Diffusely tender

Abdomen - Diffusely tender

Extremities - Shows full range of motion.  She has a bruise of her left knee.

Discharge Diagnoses:

1.  Status post motor vehicle crash
2.  Closed head injury
3.  Cervical strain
4.  Chest and abdominal contusions

**Mohammed Latif, M.D. (Tr. 416-20)**

Psychiatric Evaluation - 6/3/05

Chief Complaint: Depression/anxiety/anger outbursts

History of Present Illness: Complains of episodes of depression which can last up to three days. She has feelings of helplessness, hopelessness and worthlessness.  Concentration is poor.  Loss of interest in bike riding, nature walks and fishing for the last six months.  Sleep varies between hypersomnia to insomnia.  Appetite is poor and reports losing 4 lbs. in the last two months.  She complains of fatigue.  No suicidal ideation.

Reports history of upswings which can last up to three days during which she is laughing and caring and feels hyper and can be more productive.  During these periods she feels that she has scattered brain and also suffers from insomnia and accelerated speech and thinking.  Has resorted to buying sprees i.e. recently with her SSI checks she bought a t.v. and VCR.  No gross loss of judgment.

The patient reports that for the next three days she can have episodes of irritability, yelling, screaming and also anger outbursts.  Usually punches inanimate objects but denies being assaultive, however came close to assault her mother one time.  Throws her phone.  Anger outbursts is out of proportion to the triggering factor.

Reports having unnecessary worries almost to a delusional intensity where she believes that if she worries about something then the negative outcome could be avoided but if she does not worry, then she can face negative consequences.  She has agoraphobia to crowded places where she suffers from panic attacks.  Current stressors is all related to her family dynamics and interaction with her fiancé.

Past Psychiatric History:

No previous history of psychiatric hospitalization.

Past Medical History:
History of ulcerative colitis. Had CA of cervix and multiple uterine adhesions and underwent total abdominal hysterectomy with oophorectomy three years. Appendectomy in 1986. Back surgery because of trauma and herniated disc in 1999. Status post right knee surgery in 1999. History of migraine headaches.

Substance Abuse History:
Abused alcohol form 1996 until 1999 and describes herself as a recovering alcoholic. Has not used marijuana since 1999. Drinks occasionally now. Smokes one half to one pack of cigarettes per day since age 9. No history of IV DA.

Social History:
High school education. Worked as a cashier at a truck stop and also waitressing but was unable to hold a job because of her back problems. On SSI for the last three years. The patient has no children. She lives with her sister and her three young children. Was married for one year at age 19 but divorced because of husband's abusive behavior. Has long history of sexual abuse. She is currently in good relationship for four years. Boyfriend is self employed as a landscaper.

Mental Status Exam:
Mood is slightly anxious. Affect is constricted. Thinking is coherent and goal directed. Reports vague paranoia involving her family that they don't have her best interest at heart and want to hurt her. No grandiosity. No perceptual disturbances. Cognitive functioning is intact. Judgment and insight are poor to fair.

Diagnosis:

| | |
|---|---|
| Axis I: | Bipolar Disorder, NOS, currently depressed 296.80 |
| | History of major depression, recurrent without psychotic features 296.33 |
| | Anxiety Disorder, NOS 300.00 |
| | Agoraphobia without panic disorder 300.22 |
| | Impulse Control Disorder, NOS 312.30 |
| | Nicotine dependence |
| Axis II: | Deferred |
| Axis III: | Ulcerative colitis, history of CA of cervix and status post hysterectomy, status post appendectomy, history of back surgery and knee surgery |
| Axis IV: | Conflict with her family and her boyfriend |
| Axis V: | 50/65 |

**Winchester Medical Center (Tr. 421-30)**
4/12/06
Motor vehicle accident - multiple contusions knee and chest

**Tracy Cosner-Sheperd, M.S. (Tr. 431-38)**
WV DDS Mental Status Examination 5/16/07

## Presenting Symptoms:

She said that she does not deal well with the public. She said that she gets upset and worried a lot. She said that being out around others and eating out has to be "low maintenance," with a few people, and she has to sit close to the bathroom. She said that if she is driving, she gets upset and will have to go back and start over a lot of times. She said she often looks for landmarks and if things are different than she is used to, then she will get upset and start over. She said, for example, if a vehicle is not parked in the same spot where it normally is, she will turn around and go back and start over again. She said that she gets upset and starts to second-guess herself often. She said that everything has to be kept orderly and in a pattern. She said that she is aware that such behavior is not "normal" and she said, "It sounds stupid to me," that she does such things. She said that she even worries that she does not worry enough about stuff. She said that she has had problems such as these before her health got bad, but she said it has been worse since her health has deteriorated. She said that she has done these types of things all her life. She said for example, she had to have the same locker in school, all throughout school. She said that she has been told by family members that she has done things that she does not remember, and she said that she did this type of thing when she was younger. She said that people will tell her that she spaces out. She said that when she gets angry, she has outbursts and will forget what she does. She said that she often feels like people watch her or judge her. She said she feels that she has to be perfect, so she will check and re-check things. She said that she cannot control her rage at times. She said that her fiancé says that she will kick and scream and fight him in bed when she is sleeping. She did report a history of sexual and physical abuse, stating the sexual abuse occurred as early as 2 years of age. She said that she does have nightmares and flashbacks, and she said that she still will look over her shoulder . She sleeps at night with a night-light, she said. She reported difficulty sleeping and said that she has to use Tylenol PM to help sleep, but she said that she still has anxiety with sleeping. She said that she has been depressed since she was young. She said she is moody and has crying spells. She said that she feels hopeless and worthless a lot. She said her ex-husband was abusive to her. She said she does not have much energy but said that some days are better than others. She said that she has had panic attacks before. She said she does not have much of an appetite and said that she has lost weight recently but said her weight often fluctuates.

## Mental Treatment History:

Stated she was diagnosed with bipolar disorder, obsessive compulsive disorder, social anxiety disorder, and possibly others and indicated that she had not received any other mental health treatment.

## Medical History:

She stated that she cannot walk, sit, or stand long because of her back. She said that she suffers from ulcerative colitis and she has to be careful of what she eats. She said that she is bothered by heat and cold. She has damaged ligaments in her knees, which tend to lock and give her problems. She said she has arthritis throughout her body. She has had back and knee surgery as well as multiple surgeries to her stomach. She had a hysterectomy in 2002.

<u>Mental Status Examination:</u>
She was cooperative and maintained fairly good eye contact and gave appropriate responses. She did ramble some but did not get off subject and her responses tended to be rather thorough. Mood was anxious and affect broad.  Thought process was within normal limits as her stream of thought was organized.  Insight was fair to average.  Immediate memory was within normal limits.  Recent memory was within normal limits.  Remote memory was within normal limits. Concentration was within normal limits.  Psychomotor behavior was within normal limits.

<u>Objective Findings:</u>
Obsessive compulsive behaviors; PTSD related symptoms such as hypervigilance, nightmares and flashbacks; other anxiety features; depression symptoms and mood disturbance; poor coping skills; history of alcohol dependence; some family dysfunction; history of abuse; chronic fears; and possible perceptual disturbances**.**

<u>Diagnoses:</u>

| Axis I: | 300.3 | Obsessive compulsive disorder |
|---|---|---|
| | 309.81 | PTSD, chronic |
| | 296.90 | Mood disorder NOS |
| | 305.00 | Alcohol abuse |
| Axis II: | V71.09 | No diagnosis |
| Axis III: | | Ulcerative colitis |
| | | Damaged ligaments in knees |
| | | Arthritis throughout body |
| | | Neck problems |
| | | Sensitivity to heat and cold |
| | | Chronic back problems |

<u>Prognosis:</u>
Fair

Concentration, persistence, pace and memory all within normal limits.

D.      <u>Testimonial Evidence</u>

        Testimony was taken at the hearing held on October 18, 2006.  The following portions of

the testimony are relevant to the disposition of the case:

        A       I was working as a cashier in Hancock, Maryland at a truck stop.

        Q       What was the name of the truck stop?

        A       Little Sandy's.

Q        How long did you work there?

A        It was almost a week.

Q        Why only a week?

A        I wasn't able to stand for a long period of time.

Q        What did you do before that?

A        Stayed at home with my parents.

Q        What work did you do before that?

A        Miscellaneous jobs.  I was a cashier, customer service representative.

Q        (INAUDIBLE) so we have an idea of what those jobs are.  Before Little Sandy's, where'd you work?

A        I'm trying to remember actually.  7-11.

Q        How long did you work at 7-11?

A        I'm not sure as, three or four months.

Q        What did you do there?

A        I was a cashier.

Q        Any other duties besides the cashier?

A        Stocking the coolers.

Q        Anything else?

A        And before that, I worked at - -

Q        At 7-11, any other duties at 7-11 besides stocking the coolers and running the (INAUDIBLE)?

A        No, sir.

Q        You ever have to mop the floor?

A        No, sir.

Q        All right.  Before 7-11, you worked - - I've got 7-11 from 2002 to 2003, a total of
about 6000, a little less than $6,000.  You say that was only for three or four months?

A        That looks like Stateline (Phonetic) to me, sir.

Q        No, I'm talking about the 7-11 job - -

CLMT        He's talking about 7-11 and 3000.

ALJ        - - in 2002, 2003.

ATTY        2002 is - -

BY ADMINISTRATIVE LAW JUDGE:

Q        You said you thought that was about three to four months.

A        It may have been longer than that.  I can't exactly remember.

Q        Well, let's, let's, let's, just so I have an idea, were you working full-time at 7-11?

A        I was working part-time, but I worked a lot of overtime.  They were really short-
handed.

Q        Okay, so how many days a week would you normally work?

A        They would normally have me on schedule four, but I could work seven.

Q        You worked four to seven days a week?

A        Right.

Q        Now, when you went in, how long would you work?

A        It depended on their scheduling.  I could work four hours a day.  I could work
eight hours a day.  I was supposed to only work four hours a day.

14

Q       And before that you worked at the Exxon station - -

A       Yes, yes, sir.

Q       How long did you work there?

A       June, July, August, three months.

Q       What did you do there?

A       I was a cashier/stocker.

Q       Was that a convenience store or was it just a little booth or what?

A       It was a convenience store.

Q       For Arrowtech (Phonetic), what did they have you doing?

A       To be honest with you, I can't remember which one Arrowtech was.

Q       Temporary service?

A       Yes, sir.

Q       Remember, can you remember what kind of jobs they sent you out on?

A       I'm not sure if that was the restaurant Roy Rogers or if that wasn't. I can't really remember that one.

Q       All right. Well, how long did you work at Roy Rogers?

A       I was there at Roy Rogers for about a month and a half, two months.

Q       And what did you do for them?

A       I was a cashier, front line person.

Q       You worked at Little Sandy's back in '99 also?

A       Yes, sir.

Q       How long did you work there that time?

A       June, July, three months.

Q       What did you do then?

A       I was a waitress then.

CLMT        (INAUDIBLE).

ATTY        He'll get there.

CLMT        Okay.

BY ADMINISTRATIVE LAW JUDGE:

Q       You worked for Citicorp (Phonetic).  What'd  you do for Citicorp?

A       Customer service representative.

Q       How long did you do that?

A       Seven months, I think.  January - -

Q       What were your duties?

A       Answer the phones, take care of the billing accounts for customers.

Q       How would you take care of the accounts?

A       We'd have to take care of the their billing, like if they had questions on their credit card bill, issuing them credits and debits off their cards.

Q       You (INAUDIBLE) of short-term jobs.  You worked for a while in '96 for Valpack (Phonetic).

A       Yes, sir.

Q       What did you do for Valpack?

A       I was a secretary.

Q       What kinds of things did you do as a secretary?

A        Did most of the filing and setting up new accounts for her new customers.  I did that through the high school years.

Q        And how long did you do that?

A        It was off and on for two summers.  I see that it only says for '96.  I don't know if that she reported it in '95, but I worked two summers with her.

Q        The longest job you think you had was (INAUDIBLE) for seven months.  Why is that?

A        Most of the jobs that I worked was because it didn't have like the, the ability to sit, stand, take care of you know, lifting and carrying stuff like that and I, I tried to do the job, tried to work as hard as I could, but there are a lot of things I couldn't do and it caused a lot of conflict with the other employees in the company.

ALJ            You may question.

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q        When you did the credit card billing, you had to deal, talk with people on the phone about billing, about their credit cards?

A        Yes, sir.

Q        Was that fairly stressful?

A        Oh yes.

Q        Do you think if you physically felt fine now, you would be able to handle the stress of a job like that?

A        No, sir.

Q        Okay.  And is that true of secretary as well?

A       Yes, sir.

                        *               *               *

Q       Okay.  And you went to Dr. Lateef for it looks like several months.  Was that helping you?

A       Yes.

Q       Okay.  And in what way was it helping you?

A       I was finally able to go outside the home.  I was becoming, as some would say, cabin fever.  I would want to stay indoors.  I wouldn't go nowhere.  I'd hide out.  I'd become a hermit, and whenever I started seeing him, I was able to go back to the grocery store and sit in a restaurant.  I had dinner at a restaurant one night and it was really great because I hadn't done that in a long time.

Q       Okay.  And he prescribed medications for you.  Is that correct?

A       Yes, sir.

Q       And did you have any side effects from those medications?

A       The one medicine made me a zombie.  I wanted to sleep all the time and I don't, I think that was the Limictol (Phonetic) that he had me on.  And I just, I just didn't function and he started adjusting it a little bit and I started getting to where I could go outside and do things, and I wasn't sleeping constantly.

Q       Okay, now when, when he first saw you, he said you had, you had feelings of helplessness, hopelessness and worthlessness.

A       Yes, sir.

Q       Is that something that you still have?

A        Yes, sir.

Q        Okay.  And during the time that he was treating you, did that, was that alleviated to some degree?

A        It was getting better.

Q        Okay.  He also said that you had hobbies of bike riding, nature walks and fishing, that you hadn't done for a long period of time.

A        That was childhood things that I had done, yes.

Q        Okay.  Well, he said you hadn't done it for six months, but you - -

A        It had been longer than that.

Q        Okay.  Have you resumed any of those?

A        No.

Q        Okay.

A        I'm afraid to go out of the house by myself.  It's not, that's not to say that I would never go out of my house by myself.  It's to say that if I went out by myself, I'd be afraid of something happening to me, per getting sick, not knowing where I was.

Q        Now we had a significant period of time where we, you were out of touch with us. Is that fair to say?

A        Yes, sir.

Q        Was that because you were being reclusive or was that just, you didn't care, or was that just - -

A        No.  It wasn't that I didn't care.  It was misunderstanding through several, several different areas.  I had moved.  I was staying with my parents and everything and I'd go down.

My address was still in West Virginia.  It should have been transferred back.  My mail wasn't getting to me.  That was one reason, but the other reason was I thought that Social Security had said no more that they wasn't even, because of my age and I gave up.  And then I wasn't really for sure if that you were the lawyers anymore, that I had retained.

Q      You thought we'd give up.

A      Yeah.

Q      Okay.

A      I thought that I - - since I hadn't heard anything.

Q      Okay.  And at the time you saw Dr. Lateef, you said you felt like you were scatterbrained?

A      Um-hum.

Q      Is that still the case?

A      Yes, sir.

Q      And was he helping you with that?  Was the medication helping you with that?

A      To an extent.  I still wasn't able to go to the normal, familiar places and know exactly where I was, like traveling from my home now to my parents.  I would get disoriented and think I was lost, and I would convince myself I was lost.  I still did that to not as much of an extreme as I did without the medicine.

Q      Okay.  And you also complained of insomnia when you went to see Dr. Lateef.

A      Um-hum.

Q      Do you still have trouble with that?

A      Yes.

Q      Did you sleep last night?

A      No.

Q      And how much do you usually sleep in a night?

A      Depending on, I can sleep actually, if I just go, nobody's around, I can sleep 23 out of 24 hours a day.  If it, there's something go on, like with my fiancee or my family or something, I may not sleep for three or four days.  In a normal night, I'd say I'd probably sleep maybe three, four hours straight through, with no interruptions.

Q      Now Dr. Lateef said you also had some problem with buying sprees.  You would just go out and spend money?

A      Yes.

Q      Has that happened recently?

A      No.

Q      Has that happened since you've seen Dr. Lateef?

A      No, it hasn't.

Q      Okay.

A      I have limited funding.

Q      Well, that helps, at least to that.  He said that you would have periods of irritability and anger outbursts.  Is that still going on?

A      Yes.

Q      And when was the last time that happened?

A      Matter of fact it was yesterday.

Q      Okay.  And what, what happened yesterday?

A        I got into an argument with my fiancee, just over dealing with this.  I got into a outrage as to how that I'm going to deal with this if somebody does say that there is something wrong.  I'm not looking, I mean I, this is something I, I don't know if I can say this or not, but I'm not looking for somebody to give me a handout.  I'm looking for somebody to help me and I'm afraid if I ask too many people for help, it's going to get me into a lot of trouble and I'm going to end up being - - as I joke to you about the padded room.

Q        You're, you're afraid of being institutionalized.

A        Yeah, because I know there's something wrong and I don't know how to deal with it, and I'm afraid my family's going to walk out on me because of this.

Q        Now you've also had a lot of, a lot of surgery in your abdominal area.  Is that fair to say?

A        Yes, sir.

Q        How does this still affect you?

A        On a daily basis, everyday.

Q        And tell us how.

A        Well, for one, I'm a person who wanted children and I can't have kids.

Q        Were you - - one time you were pregnant and you were struck 67 times?

A        Yes, sir.

Q        Do you remember that?  Does that still affect you?

A        Yes, sir.  I still have nightmares.  I'm afraid to get close to any male because of things that's happened to me over the years, but that one is one that sticks with me.  And I feel it everyday, because that's one reason why that I can't have kids.

Q    Okay.  How how have the abdominal problems you had affected you physically?

A    Physically?

Q    Um-hum.  Do you still have like stomach pain, cramps, or - -

A    Yeah, I have - - the cramping, it depends on - - I try not to get upset.  I try not to eat the wrong things.  I have to watch what I eat.  I have to watch what I do because I, it could hurt my stomach.  I have to watch if somebody hits my stomach or you know, wrestling around, joking around with you know, my nieces or nephews.  I have to be extremely careful because the wrong move and I can be doubled over for three days on the couch.  It feels some like, sometimes like somebody's you know, kicking me or stabbing me in the stomach, sharp, excruciating pain.

Q    And when was that last time this happened, when you had abdominal pain?

A    The day before yesterday.

Q    And was that provoked by anything or did that just happen?

A    Just my nerves.  My sister is going through some things right now and I'm taking it really hard because she just had a miscarriage.

Q    If you get upset, which seems to happen a lot, how does that affect your abdominal pain?

A    It, it intensifies extremely.

Q    And I know these things aren't easy to talk about but I mean, do you just have pain?  Will you go to the bathroom more?  Will you have diarrhea?

A    All of the above, actually.  I have - - the pain starts and then usually my stomach tightens up and then I get diarrhea from, it's not really constipation but whenever that my

stomach cramps up, it locks on me and I might not you know, lay on the couch for a little while and then I get diarrhea. But it feels like I'm constipated but it's diarrhea. A lot of that's from the ulcerative colitis because when you get knots like that in your stomach or get upset and tense up, your muscles contract and when the muscles contract, they release faster than normal and that causes diarrhea. But it can be onset by foods or being upset. Usually when it's upset and I'm cramping, I know the next day I'm going to be on the couch because my ulcers are flaring up or my stomach's just bothering me, if that makes any sense.

Q       And what kind of food do you have to avoid?

A       Anything with spice in it. I can't have a lot of bread product, a lot of pasta. I can't have no green foods. I'm limited to, I might be able to grab a piece of broccoli you know, once a month, if, if that doesn't bother my stomach. I can't have any type of gassy food whatsoever. The bread products, I have to be very, very careful with pasta. It can tie my stomach up in knots and spices tears me up immediately, and I'm vomiting, nausea - -

Q       So what kind of food can you eat?

A       I try to stick to the bland foods, chicken noodle soup, homemade. I try to stick to you know, the white meats like chicken breast or fish and pork. I try to stay away from any red meat. Occasionally, I might grab a hamburger and regret it the next day, but I have to be very careful and limit myself to how much I can eat. If I eat too much, then I'm sick. If I don't eat enough, then I'm sick and there's no happy medium.

Q       Now, you've had back surgery when you were quite young, about 20?

A       Yes, sir.

Q       Does that still affect you?

A       Yes, sir.

Q       Can you describe that?

A       I had a two-hour ride down here this morning and I have been in pain in my lower back since I've been here.  It requires me to have to move around, twist and shift and keep my weight off my buttocks, and it just hurts.  I mean I'm - -

Q       Now you had a knee surgery on your right knee when you were fairly young, too.  Is that correct?

A       21, I think, yes.

Q       And does, does your right knee still bother you?

A       Yes, sir.

Q       And can you describe that?

A       I have to walk like I'm walking on ice all the time.  Somebody who walks on ice knows that you have to watch your stability.  You have to watch how you step because at any time I could twist my knee out.  I can sprain it by walking like everybody else does.  It can shift on me at any time.

Q       And you recently had a motor vehicle accident in April.  Is that correct?

A       Yes, sir.

Q       You, what did you injure in that accident?

A       The lower part of my leg. It wasn't my knee.  It was right below my knee.

Q       Okay.

A       And my neck.

Q       Okay.  And do you have any litigation pending on the basis of that?

A       They closed that.  We settled on it.

Q       Okay.  What was the settlement for, if you remember?

A       My - - it was actually for me.  They, it was for the medical bill coverage - -

Q       Okay.

A       - - and some restitution.

Q       Okay.  Well, that's my question.  How much did they - -

A       22-19 something.  It was $2,200.

Q       Okay.

A       Somewhere there close.

Q       Now you live in a trailer?

A       Yes, sir.

Q       Okay.  And you live with your fiancee.

A       Yes, sir.

Q       Okay.  You do any yard work around the trailer?

A       No, sir.

Q       Who does that?

A       My fiancee and his kids.

Q       Do you do any fishing or hunting?

A       No.

Q       Do you read the newspaper or magazines or books?

A       Occasionally.

Q       And do you watch television?

A        Yes, sir.

Q        Are you able to follow what you're reading and what you're watching?

A        If I don't fall asleep, yes, sir.

Q        Okay.  Do you have any hobbies or interests, things you do for fun?

A        I don't really have hobbies.  I mean I pretty much gave up on doing a lot of things.  The only thing I do anymore is I do go with my fiancee to a friend's house and watch him play guitar.  That's not really a hobby but that's the only thing I really do anymore.

*          *          *

Q        Okay.  And what do you do to pass the time when he's not there?

A        Pace the floor, worry if he's going to make it home, talk to my cats.

Q        Dr. Lateef said that sometimes you have a, you think that you can avoid a negative outcome by worrying.

A        Yes.

Q        Okay.  Is that still the case?

A        Yes.  If I worry enough, it won't happen.

Q        And, then sometimes he says that you, you're afraid not to worry, because then - -

A        Yes.

Q        - - something, it will happen.

A        It will happen.

Q        That's still, you still feel that way?

A        Yes.  It sounds crazy, but that's just my way of thinking.

*          *          *

Q     Do you ever do any housework around the house, like sweep with a broom?

A     As much as I can, yes.

Q     Okay.  Do you keep the place spotless?  Do you keep the place - -

A     It's livable.

Q     Livable, okay.  Because you seem to have a lot of time, so you can, you can - -

A     As I see it needs done, I try to do it if I can.

Q     Okay.  So you do some mopping as well.

A     Yes, sir.

Q     Vacuuming?

A     Yes, sir.

Q     Make your beds?

A     Yes, sir.

Q     Take out the trash?

A     I do that occasionally.  I don't have to do that all the time either.  If somebody else sees it and they grab it.  It's not an everyday thing.

                    *               *               *

Q     Do you have any problem using your hands?

A     I have arthritis in my hands.  I like try - - my wrists snap all the time but I - -

Q     Do you still drive occasionally?

A     Occasionally.

Q     Okay.  And do you ever go places by yourself in the car?

A     I try very hard not to.  If I can have somebody go with me to kind of keep me

focused.

Q    Do you ever go shopping with your fiancee?

A    Yes.

Q    Okay.  Have any trouble going in and out of the stores?

A    Extreme difficulty.

Q    And why is that?

A    I can have $300 in my pocket from where  that  he's you know, went to work, and I can be at the register with $20 worth of groceries and I'm afraid I don't have enough.  I get nervous when it comes to - -

Q    Checking out?

A    - - checking out.  And if there's a lot of people in the store - -

Q    Um-hum.

A    - - I have actually been known to have a full cart, leave it in the middle of the aisle, and go running for the door.  I don't deal well with a lot of people.  If there's a lot of noise, I shake and I have to leave.  I left Walmart in the middle of the night one night because of this.

                            *               *               *

Q    So where you're living is with your fiancee, you and who else?

A    His two kids.  His older son - -

Q    How old are they?

A    16 and 15.

Q    So you drive one of them to the bus stop?

A    Yes, sir.  The 16 year old goes with me in the mornings and then the evenings, his

29

father, their father picks them up, her up.

Q	Do you dress yourself?

A	Yes, sir.

Q	Do you bathe yourself?

A	Yes, sir.

Q	Take care of your hair?

A	With difficulty.

Q	Tie your shoes?

A	Yes, sir, with, with some assistance occasionally.

Q	How far can you walk (INAUDIBLE), on a level surface?

A	On a level surface, I don't know how distance-wise that is. I can - -

Q	Time or distance.

A	Time-wise I can probably walk flat land, probably about a half hour without needing to stop for anything. If it's a hill area, that's a different story.

Q	If it's hilly, (INAUDIBLE).

A	I'm sorry.

Q	If it was hilly, how far then?

A	If it's hilly, I'd probably have to stop - - my neighbor lives about 500 yards from my house and I have to stop three or four different times just to get to my neighbor's.

Q	How long can you stand before you have to sit down?

A	Approximately 10-15 minutes. Oh, sitting, or did you say standing?

Q	Standing.

A    Standing.  I can stand probably 20, 25 minutes if that I keep shifting my weight from one leg to the other.  I can't stand in one position for more than five minutes.

Q    How long can you sit?

A    10-15 minutes tops, again, shifting the weight.

Q    Are you able to reach in front of you?

A    Yes, sir.

Q    Can you reach overhead?

A    With some difficulty.

Q    What difficulty is it?

A    It causes my shoulders to draw, to draw up and my back.

Q    How much can you lift?

A    If it's something that I have to lift, I force myself to do it, I'm not supposed to lift over five pounds.

Q    And how much do you lift?

A    I have a nephew who weighs approximately 35, 40 pounds.  If they jump for a hug and I have to catch him, I have to hold him.

Q    Who told you you're not supposed to lift over five pounds?

A    Every doctor that I've seen regarding my back.

Q    What was the last one?

A    The last doctor that I've seen in regards to my back was Dr. Chadick (Phonetic), and he's the one who performed the surgery on me.

Q    Can you bend or stoop to pick something up off the floor?

A       Very cautiously.

Q       Do you cook?

A       Occasionally, yes.

Q       How often's that?

A       Maybe every other night.

Q       Do you do dishes?

A       Yes, sir.

*             *             *

A       Yes.  I wanted to give past work and that of a cashier.  And there were several different scenarios, in which she worked as a cashier, but the work was similar and I will indicate that work would have been unskilled and light.  There was also past work as a waitress which I would indicate would be unskilled and light.  There was past work as a customer service rep., basically that work would be described at semi-skilled and sedentary.   And then there was past work, described by the claimant as a secretary, but it was done during a few months of the summer while in school and the work that she described were not indicated as the full range of secretarial duties, but I would indicate a low range of semi-skilled and sedentary.

Q       You may have an individual of the same age, education, past work experience (INAUDIBLE), residual functional capacity, (INAUDIBLE) occasional to lift 50 pounds, frequently 25, stand or walk six hours in the (INAUDIBLE) work day, (INAUDIBLE), limited pushing and pulling, and occasionally climbing ramps and stairs, (INAUDIBLE) and frequently balance, stoop, kneel, crouch or crawl.  (INAUDIBLE) such an individual could perform?

A       I would indicate yes, Your Honor.

32

Q      Could she do the past work?

A      Yes, Your Honor.  I would indicate with the limitations of 50 pounds would be in the medium exertional range, and the past work was basically light and sedentary exertion.  I would indicate she could do the past work.

Q      (INAUDIBLE) for a light exertional capacity with occasional (INAUDIBLE).  Not only the occasional climbing of ramps and stairs, (INAUDIBLE) only occasional balance, stooping, kneel, crouch or crawl.  Also allow the individual to alternate the positions let's say, every half hour.

A      I would indicate a light, unskilled office helper and in the region, there'd be approximately 750 jobs, and in the national economy, there would be approximately 350,000.  I would also indicate a light, unskilled information clerk, and in the region there'd be approximately 350 jobs and in the national economy, there'd be approximately 150,000.  And also I would indicate a light, unskilled bench worker and in the region, there would be approximately 900 jobs, and in the national economy, there would be approximately 190,000.

Q      Reduce the lifting down to 10 pound occasional lifting, (INAUDIBLE).

A      I would indicate a sedentary, unskilled office helper and in the region, there would be approximately 500 jobs and in the national economy, there would be approximately 220,000.  And also a sedentary, unskilled sorter and in the region, there would be approximately 350 jobs and in the national economy, there would be approximately 45,000.

Q      What was the local on the sorter?

A      350.

Q      350.  Then if we were to limit the exertion to routine, repetitive, simple tasks with

33

minimal interaction with others, how would that affect the jobs you listed previously?

A    I would indicate that at the sedentary exertional level, would do the jobs, the office helper position would not have the attraction (INAUDIBLE) office environment. And I did give information clerk I believe, as a light position, would not be able to do that job.

Q    (INAUDIBLE).

A    No, Your Honor.

ALJ    You may question.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

ATTY    Let me add to the hypothetical. The claimant has an Axis 5, GAF of 50. Any jobs (AUDIBLE) including a, obviously the hypothetical jobs with that kind of a psychiatric limitation?

VE    I would indicate no.

ATTY    I have no further questions, Your Honor.

ALJ    Closing.

ATTY    Yes, Your Honor. Dr. Lateef did indicate during that one brief period of her life when she had health insurance and had means to do psychiatric treatment, that her Axis 5, current Axis 5 was 50. I think she said she's an individual without health insurance and has been alleging to mental impairment for some time. It might be fruitful to send her out for CE if you don't believe the Axis 5 at 50 reflects her current functioning. That's all I have, Your Honor.

                    *            *            *

E.    Lifestyle Evidence

34

The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how claimant's alleged impairments affect her daily life:

•　　Gets kids off to school in the morning.  (Tr. 77, 469).

•　　Takes care of sister's child during the day.  (Tr. 77).

•　　Cleans the house.  (Tr. 77, 466, 469).

•　　Cooks dinner and prepares other meals.  (Tr. 77, 79, 472).

•　　Helps children with homework.  (Tr. 77).

•　　Does not go outside very often.  (Tr. 80).

•　　Drives, but not often.  (Tr. 80, 468).

•　　Shops for necessary items.  (Tr. 80).

•　　Reads, watches tv, plays with the children.  (Tr. 81).

•　　Spends time with others, including sister, other family members and fiancé.  (Tr. 81).

•　　Occasionally needs help to the bathroom in case she falls.  (Tr. 96).

•　　Has trouble climbing steps.  (Tr. 466).

•　　Dresses and bathes herself.  (Tr. 469-70).

### III.  The Motions for Summary Judgment

A.　　<u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant alleges that the mental limitations contained in the ALJ's questioning of the VE were internally inconsistent with the narrative decision.  Couched within this argument, Claimant criticizes the agency for "neglect[ing]" to do the development of Claimant's mental

impairment at the initial and reconsideration level; claims that the ALJ's RFC assessment was not a mental assessment and offers no guidance; alleges that the agency failed to evaluate Claimant's impairment according to the criteria of 20 C.F.R. § 404.1520a(e)(2)(2007) at all four levels of review; and argues that the ALJ failed to rely on any medical opinion and improperly failed to give any weight to Dr. Latif's Axis V GAF score which eliminated all work when the VE was cross-examined. Additionally, in the Claimant's second and final listed argument, she argues that remand is required because a portion of the ALJ's questioning of the VE was partially inaudible.

Commissioner maintains that substantial evidence supports the ALJ's decision. Specifically, Commissioner agrees with Claimant that the ALJ's restriction to unskilled work is different from limitations that the ALJ posed to the VE at the hearing. Commissioner argues that the limitations posed in the ALJ's hypothetical question were more restrictive than the limitations the ALJ set forth in his RFC determination. Therefore, Commissioner avers that the ALJ did not err in relying upon the VE's testimony because the VE advised that the more restrictive limitations contained in the hypothetical question would not prevent someone like Claimant from being able to perform 265,000 unskilled jobs in the national economy. Commissioner responded to Claimant's arguments and criticisms as follows: 1) Commissioner contends that it was the State agency that obtained Claimant's records that contained depression/anxiety evaluations, but these records did not suggest Claimant had a severe mental impairment. As for Dr. Latif's records, Claimant argues that Dr. Latif was not identified as a treating source until Claimant filed her request for a hearing on July 30, 2005 and it is disingenuous for her to criticize the State agency for not obtaining Dr. Latif's records; 2) Claimant is wrong that the ALJ's RFC assessment was not a "mental assessment" because an RFC determination for unskilled work entails a mental assessment; 3) Claimant's reliance on Social

Security Ruling (SSR) 83-20 and SSR 96-2p is misguided because neither SSR provides that an ALJ must rely on medical opinion evidence when he determines an individual's mental RFC; and 4) The ALJ considered Dr. Latif's GAF rating. Finally, Commissioner responds to Claimant's second and final listed argument that remand is warranted because the ALJ's questioning of the VE was partially inaudible. Commissioner maintains that the VE's testimony was clear that given an unskilled work restriction, there were a significant number of jobs that someone like [Claimant] could perform and absent an indication that the missing portion of the transcript bolstered [Claimant's] argument or prevented judicial review, the Court should not remand the case based upon inaudible portions of the record. Williams v. Barnhart, 289 F.3d 556, 557-58 (8th Cir. 2002).

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review. Only a final determination of the Commissioner may receive

judicial review.  See 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.    <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

       8.     Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

       9.     Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

      10.     Social Security - Substantial Evidence - Listed Impairment.  In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does

not meet or equal a listed impairment.  <u>Cook</u>, 783 F.2d at 1168.  The ALJ must identify the

standard to be applied.  <u>Id.</u> At 1173.  The ALJ should compare each of the listed criteria to the

evidence of Claimant's symptoms and explore all relevant facts.  <u>Id</u>

      11.    <u>Social Security - Listing</u>.  The ALJ must fully analyze whether a Claimant's

impairment meets or equals a "Listing" where there is factual support that a listing could be met.

<u>Cook</u> , 783 F.2d at 1168.  <u>Cook</u> "does not establish an inflexible rule requiring an exhaustive

point-by-point discussion in all cases."  <u>Russell v. Chater</u>, No. 94-2371 (4th Cir. July 7, 1995)

(unpublished).[7]  In determining disability, the ALJ is required to determine whether Claimant's

condition is medically equal in severity to a listing.  20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3).

The ALJ is required to explain his findings at each step of the evaluation process so that the

reviewing court can make determinations on whether his decision is supported by substantial

evidence.  <u>Gordon</u>, 725 F.2d 231.  <u>See also</u> <u>Myers v. Califano</u>, 611 F.2d 980, 983 (4th Cir. 1980).

      12.    <u>Social Security - Claimant's Credibility</u>.  "Because he had the opportunity to

observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations

concerning these questions are to be given great weight."  <u>Shively v. Heckler</u>, 739 F.2d 987, 989

(4th Cir. 1984) citing <u>Tyler v. Weinberger</u>, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing

officers are in the best position to see and hear the witnesses and assess their forthrightness, we

afford their credibility determinations special deference.  <u>See</u> <u>Nelson v. Apfel</u>, 131 F.3d 1228,

1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant

can show it was 'patently wrong'"  <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) citing

<u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990).

---

    [7] See FN 7.

13. <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. <u>Id</u>. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. <u>Id</u>. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. <u>Id</u>. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. <u>Id</u>

C.    <u>Discussion</u>

1.    <u>Inconsistencies Between the Mental Limitations Contained in the Questioning of the VE and the RFC Provided in the ALJ's Narrative Decision</u>

Claimant argues that it was an error on the part of the ALJ to submit a hypothetical to the VE with different terms than what appear in his narrative decision. Commissioner agrees with Claimant that the limitations posed by the ALJ to the VE at the hearing differ from those contained in the ALJ's RFC. However, Commissioner maintains that the ALJ's hypothetical was more restrictive than the limitations contained in his RFC.

A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical

condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. Id.

During step five of the sequential analysis, the ALJ is responsible for reasonably setting forth all of Claimant's impairments in the hypothetical posed to the VE. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); SSR 96-5p (1996). In other words, the hypothetical must "adequately reflect" a persons's impairments. Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005). However, the ALJ's hypothetical need only include those limitations supported by the record. Id. The limitations and impairments included in the hypothetical should reflect the Claimant's RFC. 20 C.F.R. § 404.1545; SSR 96-8p.

The ALJ, in his written decision, determined that Claimant had the RFC to:

> [P]erform a range of light exertional work. Claimant can lift/carry 10 pounds occasionally and less than 10 pounds frequently, stand/walk for 6 hours out of an 8 hour workday, and sit for 6 hours out of an 8 hour workday. Claimant can only occasionally climb, balance, stoop, kneel, crouch and crawl, she needs to periodically shift positions while standing or sitting, and her mild difficulties maintaining concentration, persistence or pace limit her to unskilled work.

(Tr. 21, 24).

During the ALJ's questioning of the VE, he gave the following hypothetical:

> You may have an individual of the same age, education, past work experience (INAUDIBLE), residual functional capacity, (INAUDIBLE) occasional to lift 50 pounds, frequently 25, stand or walk six hours in the (INAUDIBLE) work day, (INAUDIBLE), limited pushing and pulling, and occasionally climbing ramps and stairs, (INAUDIBLE) and frequently balance, stoop, kneel, crouch or crawl.

(INAUDIBLE) such an individual could perform.

(Tr. 473).

The VE answered: "I would indicate with the limitations of 50 pounds would be in the medium exertional range, and the past work was basically light and sedentary exertion. I would indicate she could do the past work." (Tr. 473). The ALJ followed up with the same hypothetical but with the additional restriction of alternating positions every half hour. (Tr. 474). The VE responded:

> I would indicate a light, unskilled office helper and in the region, there'd be approximately 750 jobs, and in the national economy, there would be approximately 350,000. I would also indicate a light, unskilled information clerk, and in the region there'd be approximately 350 jobs and in the national economy, there'd be approximately 150,000. And also I would indicate a light, unskilled bench worker and in the region, there would be approximately 900 jobs, and in the national economy, there would be approximately 190,000.

The ALJ then further added to his hypothetical by way of an additional restriction that would reduce lifting down to 10 pound occasional lifting. (Tr. 474). Again, the VE found that there were jobs in the economy that someone with the restrictions outlined by the ALJ could perform. He stated:

> "I would indicate a sedentary, unskilled office helper and in the region, there would be approximately 500 jobs and in the national economy, there would be approximately 220,000. And also a sedentary, unskilled sorter and in the region, there would be approximately 350 jobs and in the national economy, there would be approximately 45,000."

The ALJ then added his final additional restriction, limiting the exertion to "routine, repetitive, simple tasks with minimal interaction with others, how would that affect the jobs you listed previously?" (Tr. 475). The VE responded: "I would indicate that at the sedentary exertional level, would do the jobs, the office helper position would not have the attraction (INAUDIBLE)

office environment.  And I did give information clerk, I believe, as a light position, would not be able to do that job.

Pursuant to 20 C.F.R. §§ 404.1566(e), 416.966(e), an ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the Claimant can perform. In <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989), the Fourth Circuit held that "[t]he purpose of bringing in a vocational expert is to *assist* the ALJ in determining whether there is work available in the national economy which the particular claimant can perform."  (*emphasis added*) In <u>English v. Shalala</u>, 10 F.3d 1080, 1085 (4th Cir. 1993)(*citing* <u>Walker v. Bowen</u>, 876 F.2d 1097, 1100 (4th Cir. 1989)), the Fourth Circuit held that, when "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment."

The question is whether the hypothetical question properly set forth all the relevant evidence of record concerning Claimant's impairments.  The Fourth Circuit Court of Appeal has held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record.  <u>Russell v. Barnhart</u>, No. 02-1201, 2003 WL 257494, at ** 4 (4th Cir. Feb. 7, 2003).  The court further stated that the hypothetical question may omit non-severe impairments, but must included those that the ALJ finds to be severe.  <u>Id</u>.  Moreover, based on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ.  <u>France v. Apfel</u>, 87 F. Supp. 2d 484, 490 (D.

Md. 2000) (citing <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th Cir.1986)).  The Undersigned believes that, at a minimum, the ALJ must include all of a claimant's limitations in his hypothetical to the VE.  However, the Court does not find that an ALJ must limit his hypothetical to a claimant's identifiable impairments.  The Court does not see the harm in posing a hypothetical to a VE that includes limitations beyond those of the particular claimant alleging disability.  If the VE determines that work exists in the national economy that the hypothetical claimant, whose limitations are more severe than those of the actual claimant, could perform, the Court believes this is further support for a finding of non-disability.  Such was the case before the ALJ here.

The ALJ's hypothetical to the vocational expert incorporated Claimant's limitations that are supported by the record.  The Court agrees with Claimant that the ALJ's RFC determination, as outlined in his written decision, does not mirror the hypothetical posed to the ALJ.  However, it is the duty of the ALJ to make factual findings and resolve conflicts in the evidence.  <u>Hayes</u>, 907 F.2d at 1456.  This Court cannot say that, in light of the evidence of record and the evidence outlined in the ALJ's decision, there was not substantial evidence for the ALJ's determination of Claimant's RFC.

Substantial evidence supports the ALJ's decision to withhold the limitation that required minimal interaction with others from his final RFC determination.  The evidence of record does not support a conclusion that Claimant should have minimal interaction with others.  Claimant routinely interacts with her fiancé and his children along with her sister and her children.  Claimant testified that she "go[es] with my fiancé to a friend's house and watch him play guitar." (Tr. 464).  The ALJ properly considered the medical evidence of record, the hearing testimony of

Claimant and the VE as well as the combined impairments and subjective complaints of pain

when determining Claimant's RFC and therefore, substantial evidence supports his decision.

      2.      <u>Failure by State Agency to Develop the Evidence of Claimant's Mental Functioning at the Initial and Reconsideration Levels of Review</u>

Claimant argues that the ALJ undertook to formulate a Mental RFC for Claimant because

the initial and reconsideration determinations and even the consultative psychologist utterly and

thoroughly failed to do so.  The Court believes that it is irrelevant whether the evidence of

Claimant's mental functioning was developed at the initial and reconsideration levels because

the ALJ reviewed the medical record before him and there was substantial evidence to support

his decision.  The Court must address whether the ALJ has analyzed all of the relevant evidence

and sufficiently explained his rationale in crediting certain evidence in conducting the

"substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir.

1998).

      3.      <u>The ALJ's RFC Assessment Was Not a Mental Assessment</u>

The ALJ evaluated the records of Mohammed Latif, M.D.  Claimant began seeing Dr.

Latif in June 2005.  The ALJ noted that Claimant did not seek any mental health treatment until

this time.  (Tr. 23).   The ALJ also reviewed the report of a Mental Status Examination

conducted by Tracy L. Cosner-Shepherd, M.S.  (Id.)  The ALJ then found that Claimant's "mild

difficulties maintaining concentration, persistence or pace limit her to *unskilled work*.  (Tr.

24)(*emphasis added*).  Program Operations Manual System (POMS) DI 25020.010, *Mental

Limitations* explains that "The basic mental demands of competitive, remunerative, unskilled

work include the abilities (on a sustained basis) to understand, carry out, and remember simple

instructions; make judgments that are commensurate with the functions of unskilled work;

respond appropriately to supervision, coworkers and work situations; and deal with changes in a routine worksetting." Therefore, inherent in the ALJ's RFC determination is a finding, one that this Court believes is supported by substantial evidence, that Claimant has the mental capacity to perform work that exists in significant numbers in the national economy.

4.     <u>ALJ's Failure to Rely on a Medical Opinion</u>

Claimant argues that "the ALJ had no guidance from any informed medical opinion," and that "a case cannot be decided without reliance on any medical opinion." (Cl.'s Br. at 6). For support, Claimant cites SSR 96-2p and SSR 83-20. Claimant also cites <u>Bailey v. Chater</u>, 68 F.3d 75, 78 (4th Cir. 1995) for the proposition that "Medical findings by an ALJ without medical support are invalid."

Initially, the Court notes that Claimant's reliance on <u>Bailey</u> is misplaced. In <u>Bailey</u>, the issue facing the Fourth Circuit was an appeal of an ALJ's decision to award benefits as of a date two years beyond the date claimant ("Bailey") claimed she was disabled. The evidence regarding the onset date was ambiguous. Bailey alleged an onset date of November 30, 1989. The ALJ found that Bailey was disabled when she underwent a consultative examination in May 1992. The ALJ then arbitrarily found that Bailey was disabled six months prior to the 1992 consultative exam. The Fourth Circuit, in interpreting Social Security Ruling 83-20, reversed and remanded because the ALJ's decision to award benefits as of six months prior to the consultative exam was not supported by substantial evidence. The Undersigned notes that, while Claimant here seems to rely on <u>Bailey</u> to support her contention that the ALJ's findings in the instant case with regard to Claimant's mental impairments are invalid because they are without medical support, the <u>Bailey</u> Court found, and this Court agrees, that Social Security

Ruling 83-20 "does not expressly mandate that the ALJ consult a medical advisor in every case where the onset of disability must be inferred." Id. at 79. Furthermore, it is clear that the Bailey Court was confronted with the single issue of determining the onset date of Bailey's disability. Because Claimant in the instant case has not put the onset date at issue, the Court cannot see how Bailey is applicable to the instant case. Moreover, Claimant herself says that the record contains a report from a psychiatrist, Dr. Latif. It would appear that this directly opposes her contention that "the ALJ had no guidance from any informed medical opinion." (Cl.'s Br. at 6).

Commissioner argues that it is the ALJ's responsibility for assessing the medical severity of Claimant's impairment at the hearing level. See 20 C.F.R. §§ 404.1520a(e) (2007), 416.920a(e), 404.1527(e), 416,927(e) 2007. The Court agrees with Commissioner and notes that, while not done so expressly, it appears that the ALJ gave little weight to Dr. Latif's and Ms. Cosner-Shepherd's opinions because he determined in his RFC that Claimant had "mild difficulties maintaining concentration, persistence or pace." (Tr. 24). The Undersigned finds that these medical opinions, along with the other evidence of record, support the ALJ's RFC determination.

     5.     <u>Dr. Latif's GAF Rating Eliminated All Work When the VE Was Cross-Examined</u>

Claimant again centers her argument around the medical opinions in the record. Specifically, she directs the Court to Dr. Latif's GAF rating of 50/65. (Tr. 418). Here she cites Gordon v. Schweiker, 725 F.2d 1119 (4th Cir. 1986) for the proposition that "The ALJ must evaluate every medical opinion in the record." Claimant argues that the ALJ failed to determine if Dr. Latif's opinion, specifically Claimant's Axis V GAF score, was entitled to any weight. Commissioner argues that Claimant's interpretation of her GAF score is incorrect.

Commissioner also maintains that Claimant's reliance upon the GAF rating, as it relates to the cross-examination of the VE, is misplaced. Commissioner cites Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) to support his contention that the hypothetical question posed to the VE by Claimant's attorney on cross-examination did not "fairly set out all of the claimant's impairments that were supported by the objective medical evidence." It is Commissioner's contention that Claimant's interpretation of her GAF score is misguided.

As was noted above, the ALJ chose not to give Dr. Latif's report much weight. The ALJ noted in his decision that Dr. Latif indicated Claimant had GAFs of 50/65. "A GAF of 50 is defined by the Diagnostic and Statistical Manual of Mental Disorders as the least severe range of serious symptoms and a GAF of 65 is defined as "some mild symptoms." Rather than give a single GAF score, Dr. Latif gave a wide-range wherein Claimant's GAF score is likely to fall. Furthermore, the Global Assessment of Functioning Scale is a 100-point scale that includes ten-point ranges. If Claimant's interpretation were correct, and her GAF score was 50, she would fall within the 41-50 band, which is defined by "Severe symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." A closer look at the scale reveals that the score bands between 51 and 70 are defined by more moderate to mild symptoms. While this Court agrees with Commissioner's argument that Dr. Latif's GAF score was too unclear to base a finding of disability upon and was therefore not deserving of probative weight. See 20 C.F.R. §§ 404.1527(d)(2)-(3), 416.927(d)(2)-(3) (2007), the Court finds that the ALJ's duty to recontact under 20 C.F.R. § 416.912(e) was triggered. The Code states: "When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us

to determine whether you are disabled, we will need additional information to reach a determination or a decision." Although it was noted above that the ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel even though these considerations are more restrictive than those suggested by the ALJ, France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)), the Court finds that it would have been error in the instant case for the ALJ to reject the hypothetical posed by Claimant's counsel if he had recontacted Dr. Latif to clear any ambiguity and found Claimant's GAF score to be 50. The hypothetical posed to the VE by Claimant's attorney called for the VE to identify jobs that an individual with a GAF of 50 could perform. (Tr. 475). The VE responded that there were no jobs that an individual with such a limitation could perform. (Id.). Therefore, the Court recommends the case be remanded with specific instructions to the ALJ that he recontact Dr. Latif to determine Claimant's GAF score.

      6.      Inaudible Portions of the ALJ's Questioning of the VE at the Hearing

Claimant argues that remand is required because the VE testimony is "inaudible at crucial points." Claimant cites McGlone v. Heckler, 791 F.2d 1119 (4th Cir. 1986) to support her proposition. Commissioner maintains that the VE's testimony was clear that given an unskilled work restriction, there were a significant number of jobs that someone like [Claimant] could perform. Commissioner cites Williams v. Barnhart, 289 F.3d 556, 557-58 (8th Cir. 2002) for the proposition that the Court should not remand absent an indication that the missing portion of the transcript bolstered [Claimant's] argument or prevented judicial review.

Claimant's understanding of McGlone misses the point. In McGlone, the Fourth Circuit Court of Appeals described the hearing transcript as follows: "The transcript was prepared from

an electronic recording and sprinkled throughout it are omissions identified by the transcriber's insertion of the word "inaudible."" McGlone, 791 F.2d at 1120. Contrary to Claimant's belief, the McGlone Court did not hold that remand is "required" when the VE testimony is inaudible. Rather, the standard, as laid out in McGlone, is whether the transcript is so inadequate as to require another hearing. "Whether the transcript is inadequate depends upon the materiality of the omissions. The plaintiff shoulders the burden of showing that some material evidence was not reported or was so incompletely reported that its effect is obscured." Id.

In her brief, Claimant makes no attempt at showing the materiality of the evidence that was not reported, nor does she try to explain how the evidence was so incompletely reported as to obscure its effect. Therefore, Claimant has not met her burden under McGlone. Furthermore, the Court finds that, as previously discussed, the limitations posed in this hypothetical question were more restrictive than the limitations as set forth in the ALJ's RFC determination, which involved a restriction to only unskilled work. (Tr. 21,24). The VE's testimony was clear that there are a significant number of jobs that someone like Claimant could perform. (Tr. 474).

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED**  because: 1) the ALJ did not err in relying upon the VE's testimony regarding the number of jobs available in the national economy that Claimant could perform; 2) whether the evidence of mental functioning was developed at the initial and reconsideration levels is irrelevant to the current proceeding; 3) the ALJ's RFC assessment was a "mental assessment;" 4) the ALJ did, in fact, rely upon medical opinions in making his disability determination; and 5) remand is not warranted because the

transcript was not so inadequate as to require another hearing. However, the Court recommends the case be **REMANDED** with instructions that the ALJ recontact Dr. Latif to determine whether Claimant's GAF score is 50, or within a range of 50-65.

2. Commissioner's Motion for Summary Judgment be **GRANTED** except on the issue recommended to be remanded.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: December 2, 2008

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE